Good morning. Welcome. We are pleased to have with us on this panel a jurist who has assisted the Third Circuit in the past and whom we welcome once again, District Judge David Dowd from the Northern District of Ohio. Judge Dowd is an eminent jurist and an old friend, a longtime friend, and we are not only delighted to have him join this quorum but also we are very grateful to Judge Dowd for assisting the Third Circuit at a time when we continue to labor under chronic vacancies and require the assistance of visiting judges. And fortunately for us, experienced senior judges, both within the circuit and without, have stepped up to the plate and helped us out. And David, we're particularly grateful to you this morning that you can participate. I know that you deeply regret and in fact are envious that Judge Fischer and I are enjoying the climate of eastern Pennsylvania right now while you suffer through the climb available to you in Fort Myers, Florida. But in any event, we'll do our best to The technology, I'm assured, is working properly and we can see you well. I assume that you can see us. I can, Judge Smith. And the audio is working as well? They tell me there's just a slight delay from the time I speak until you hear me, but the audio is fine and I look forward to the arguments. Very well. Thank you. Thank you very much. And with that, we're ready to proceed to the first argument of the day, which is Jacquemus versus Hoffman, LaRoche, and Johnson controls. Mr. Skiarra. Good morning, judges. Thank you, Judge Dunbar. Thank you. Your Honor, I was advised to instruct or to ask that I was looking for three minutes of rebuttal from my client. Granted. Thank you. Your Honor, on behalf of my client, some of whom have come up today just to observe the proceedings, we thank the court for the time here to argue our case. A brief overview. The case involves Hoffman LaRoche in its Knottley plant on November 3rd, 1997, terminating my client. And then Johnson Controls International on November 4th, 1997, hiring them. They were returned to all of their same duties, same desks, same roles. Nothing changed for them except for the fact that they were no longer in the LaRoche retirement system. So no one lost a position. And all that is at issue here is in the transfer, if you will, of this block of employees from LaRoche to JCI, employees were no longer participating in a defined benefit pension plan, but instead were participating in the 401k. Judge, if I may, they had a 401k with LaRoche. I understand they also had a 401k, but they had a defined pension benefit plan. With LaRoche, which is now, they were no longer in. Right. And in terms of the transfer or anybody, there were some terminations as a result to that judgment. My clients were, to a minimum, hired by Johnson Controls or some of them retired thereafter. Your Honors, this was a reduction in force, so to speak, right? Well, it's been called a lot of things by the defendants. It was, it hasn't been called a riff, I don't believe, in any of the paperwork. I understand that. But in effect, it was. All of a sudden, LaRoche no longer has a block of employees they had before. Judge, I would think that a reduction in force would mean you go from 4,000 to 3,000 employees. In this particular case, they went from X amount of employees to the same amount of employees, essentially. The difference was... What do you mean, essentially? Were they terminated or weren't they terminated? They were terminated from LaRoche, Judge, by Johnson Controls and worked on the site and did the same work at the same plant. When I say essentially, I think that there was a difference in about 10 initially, but now they've since hired another 45,000. There's nothing wrong in and of itself about a riff under ERISA, right? Well, I think a riff is a protected business interest if it's done with good faith and not in violation of the law. So, but in this particular case, I think the peculiarities are that, in fact, they were hired by a subcontractor, LaRoche. They were brought in, they did the same work that they'd always done, returned to the same desk, did everything that was the same. Their duties were, in fact, the same, except that they were no longer in the LaRoche plant. And the result of that is that those who were a few months or a few years away from retiring as a LaRoche retiree did not get lifetime health, did not get other things that would have happened had they met the requirements under the plan. Beyond benefits themselves, there were differences in terms of their work conditions to the extent that, as you've already said, they were not employed by the same entity. But beyond that, there was a different management structure, wasn't there? Judge, we've looked at that. We've asked that question. We've gone over that repeatedly. The record is complete with really very little, by the way, of changes. They, John's control says, well, we do things differently. We went through all the- Did JCI hire all the, hire and retain all the managers who were with Roche? No, that's the, what I said essentially before, I think there were 12 or 15. That's a major difference in the working conditions, isn't it? I, in terms of, for my clients, no. The JCI brought in 12 people who were familiar with their systems as opposed to retaining 12 Roche employees. I don't think that in and of itself or overcomes an inquiry as it relates to the good faith of the argument there, the good faith of the move, the business move, as it's been called, Judge. Mr. Sciarra. Yes. How do you get beyond the statute of limitations question in this case? This suit was filed, I believe, November 1, 1999. Yes, Judge. Explain to me how you survived the statute of limitations issue, which is particularly fatal to, I think, all but one of the appellants. Judge, three reasons. A, it's my position and continues to be that, in effect, in the one case on this issue that was decided by, in the Cipollone case, that was decided within the circuit at the time of the filing of this matter, that there were no damages. My clients had no cause of action whatsoever, no damages, no cognizable action they could bring before court before November 3, 1997, which was the fact that their pension benefits under ERISA were violated, the allegations in this lawsuit. Nothing happened to them. Why do you say that? Why do I say what, Judge? Why do you say that when, as of October 20th or October 21st, or sometime between October 21st and prior to November 1st, where they were interviewed and hired by JCI, they clearly had notice that Hoffman LaRoche had made a determination to terminate them. Judge, the same people who had notice of the same exact facts were not terminated by LaRoche. They signed forms to that effect, didn't they, counsel? Judge, many people signed forms. Many of the people who signed forms went to the meeting and were advised that they weren't being terminated by LaRoche. Did they not sign forms that revealed their understanding that their employment with LaRoche was ending on about November 1, 1997? I don't believe so, Judge. What they did was, at the October 20th meeting, they were shepherded and offered the opportunity to work for JCI if they wanted. They filled out application materials. Simultaneously, people who were doing that, and it's in the record, Norma Girio and others, were looking for work in LaRoche and found it. So I don't know how you could have notice of termination and not be terminated and then have that retroactively. Did I understand you to deny in response to my last question that most of your clients, most of the plaintiffs, all but a few of them signed forms indicating that they understood that their employment with LaRoche was being terminated and that they would be JCI employees? Yes, Judge. You're denying? They signed employment paperwork with JCI. That much is true in a large part of them. Some of them weren't even at the meeting, upon which notice of being imputed upon them. But there was an opportunity for them to pursue employment with JCI. The JCI individual, as Patashall said, you could look for a job at Roche, which much of them did, and some of them found. You could look for work with JCI, which most of my clients did, or you could quit. My point is that an unambiguous, as required in the law, notification did not occur until November 3rd when they finally knew, the defendants finally knew, who in fact was going to be terminated. I know Your Honor looked at the paperwork. The list kept changing, what department was going to be on, what department wasn't going to be on. They're attempting to give this retroactive application to, well, you may have known between that time. I ask Your Honors, at some point, someone to please advise what rights they had. I mean, if the statute started to run on October 20th, what rights did any of my clients have to file a lawsuit and seek any sort of assistance from the court until November 3rd, when nothing about their employment changed? The appellees claim that all of your clients, except for Mecham, signed paperwork at JCI prior to November 1, 1997. Do you agree with this? Do you agree with this particular finding? I agree that there's a chart in the record, which indicates that most of my clients, all my clients signed some paperwork or accepted some form of... Prior to November 1, 1997? Yes. Okay. I agree. You alluded to a fact that I'm not sure I remember from the record. Were there any Hoffman LaRoche employees who signed paperwork with JCI who, for one reason or another, were not hired by JCI on November 4th? Yes, Judge. They were retained by LaRoche. People were signing this paperwork. People were pursuing this. At the same time, people were looking for lateral work to stay within LaRoche to move along. But none of them are your clients? No, because they didn't have any cause of action. Okay. What cause of action would they possibly have until November 3rd, 1997? And the problem with the argument is, if your honors affirm this decision and require this rationale, what does another court do when a company says, we're going to terminate you in a year and a day, and in Delaware it's a year statute? Does a court now come in and start to intervene? Cipollone Court said, no, we're not going to do that. We can't do that. It is not right. So what I'm suggesting to the court is, there was no change. This is not a Title VII harassment case or some sort of issue where, on the Title VII, you don't need to be terminated to have a cause of action. You could, as a result of an unwanted touching or some kind of quid pro quo or something along those lines, you could have an action that starts, which is what the Ricks Court said. Ricks knew at that time he was the victim of discrimination. My clients heard on October 20th that, let's be clear, that the cops were going to be out. Do you agree that Ricks and Chardon controlled the statute of limitations? In 1140, absolutely not, Judge. I don't know how. When you invoked it, I was wondering if somehow you had shifted positions. No, absolutely not, Judge. You've argued for some different treatment with respect to a risk case. All I'm suggesting is that you need a cause of action, you need damages to initiate a lawsuit, and none of that happened for any of my clients until November 3rd, 1997. So there is no relief that any court could grant my clients because they're told. If someone went to a lawyer and filed a suit on October 21st, 1997, and he said, I may get fired on November 3rd, would a court entertain that? I don't think so because there's nothing that changes as it relates to their pension until November 3rd. Judge Dowd, I want to give you an opportunity here to get in because I know from a distance, telecommunications-wise, it's sometimes a little difficult to participate. Well, it occurs to me that the position of the district court is that new or should have known test applies regardless of when the date of termination is, and I frankly have some trouble with that. Comparable to the question that was raised by counsel for the plaintiffs, the appellants, if the employer tells somebody 23 months before termination that we're going to terminate you 23 months from now, do they have to file the action? When does the statute start to run, 23 months before the termination or at the termination? The problem is that what the district court has done here is applied new or should have known rule to a 5-10 action under arrest, and I'm not sure that's right. So I've got some questions for an appellee's lawyer along those lines. That's the case as it relates to that, Judge. That's my concern. The other concerns I have about the notice is it should be unambiguous. Nothing occurred, nothing was told to these people in these facts. It's not like someone had to sit down and say, you're out of here in two weeks. Nothing was told to these people until they, in fact, could not find other jobs and on November 3rd they were terminated. That is in the paperwork as it relates to the letter they received, Judge. I do have another question. As I understand it, there was another claim raised by the defendant that, in effect, the plaintiffs had accepted a buyout, so to speak, or some form of remuneration, and a secondary claim made by the appellee was that the people had to pay that money back in order to maintain the lawsuit. The district court judge never got to that issue. But if, perchance, we were to decide that plaintiff's counsel is right as far as when the statute runs, what about that issue? It seems to me the district court never addressed it. Judge, in fact, judgment was granted for us on that issue, Your Honor, as it relates to that because of the penalty indication. No cross-appeal? Well, Judge, that's an issue before Your Honors as well because we had judgment on that particular issue. No cross-appeal was filed. We saw it appear in their briefs, and we filed a motion to strike that portion because we're saying we never had notice. There was no cross-appeal on a judgment for us. With that said, Your Honor, very quickly, I see my red light on. The fact of the matter is that that, at best, would be returned to the court for a trial as to whether or not that was fraud in the district. But the settlement says the pensions won't be affected, and, of course, they were. So that becomes an issue. They were told 401Ks would be transferable. That becomes an issue. It becomes a fact issue if they are successful in the court returning the matter to the trial level for adjudications related to that. Judges, I see my time is up. I did reserve a few. I have some other issues. Let me ask you one question, Mr. Sciarra. If you survive on the limitations question, don't you need to show that there was specific intent on the part of Hoffman LaRouche to violate your client's arrears of rights? How do you show that? Judge, I think we show that with both direct evidence. I mean, we have contemporaneous writings, not the testimony that's brought in under the skill and abilities of the counsel to prepare their clients, but contemporaneous writings that say slashing headcount is the way to achieve your goal of saving money. At the very least, Judge, we offered, I believe, three… That was an e-mail response. Yes, Judge. Well, I'll let you address that rather than eat up time now, but it seems to me you're over-reading that e-mail. Oh, Judge, I may very well be, but I believe under the standards, and I will point this out, I believe under the standards that my requirement in summary judgment is to show some circumstantial evidence. The court, in this case… It all depends on whether that's a reasonable reading, this e-mail. Oh, I'm sorry, of the e-mail? Yes. Judge, that's fine. Your honors are going to be the arbiters of that, but at the end of the day, there's 16 or 17 other, including testimony that's diametrically opposed by the clients. I don't want to save money, so sure, but then we get all the documents that say save them lots of money. Those are the things that create circumstantial evidence which, under the burden shifting, at the very least, the burden shifting, where I get every favorable inference, allows me to pursue this case to a trial. That's all I'm asking for, and I think in all due respect to the district court, he weighed the evidence in favor of the defendant on almost every point. Roche represents, he says. Roche maintains. And then he makes those findings in their favor, and he says, significant, I believe, or sufficient circumstantial evidence. I couldn't find that in the case law, where you have to have sufficient circumstantial evidence. I don't know what that standard is. It's circumstantial evidence. And that is what I argued to him and what I'm arguing to your honors, that I presented numerous deficiencies in the record as it relates to diametrically opposed testimony of the different individuals on their side, what was discussed, lists that talk about people who are close to retirement, all of these other things, which I think are a factor. When someone says, clearly, I seek to save money by doing this, then it comes in and squares out and says, I wasn't seeking to save money, and then all the records indicate he was seeking to save money. We'll have you back on rebuttal, Mr. Sheehan. Thank you very much, David. Mr. Clark. Good morning. May it please the court, my name is Alan Clark, and I represent Johnson Controls and World Services. Seated at the council table with me is my partner, Danny Ware, and Mr. Ridley will be arguing for Hoffman and the Roach. We've agreed to split our time, so I only have six minutes, and I'll try to cover as much as I can. But I think the statute of limitations evidence is pretty clear. The question of money accrued has been made clear by prior Supreme Court cases, and also in cases by this court in the Courtney v. South. May I interrupt? Is it your position then, if they had given notice 23 months before the termination, that the statute had started to run then? If that were a final decision, yes. As I understand the position of the district court, it's new or should have known that they were going to be terminated. And the passage, the interval between when they knew and should have known and termination is irrelevant, as I understand it, under that test. The test, even under ERISA, the toll case from the Seventh Circuit, was an ERISA 510 case, mandatory retirement. The court said you knew you were going to be mandatory retired a year ahead of time. You knew at that point, and your cause of action accrued when you knew or should have known, and they do in that case. So you're saying we should follow the Seventh Circuit? Has the Third Circuit spoken in this issue? Not on 510, but in an age discrimination, similar result in the Courtney v. LaSalle University case. I know the honors have already heard the arguments about what was known, and obviously everybody knew they were being terminated. The question is when does it accrue? And even this court, in another case, in the Gatlin case, the question came up because there were multiple plaintiffs involved in that case, and that was an ERISA case, as to whether all the plaintiffs had standing to sue because they had not been actually harmed by the pension liability avoidance scheme. And the court said the purpose of Section 510 is to prevent unlawful action from occurring, not to just pay damages when you've actually been damaged. And that follows the same rationale of the Supreme Court in Ricks and Charbonne, that it's not when the painful consequences of the act become evident, but when the illegal act is known or you know it's going to occur. And so in Gabelak, the court said, yes, these other plaintiffs who have not been harmed have standing at least to get adjunctive relief because the purpose of 510 in ERISA is to prevent an unlawful act from occurring in the first place. So if you know an unlawful act is going to occur under Section 510, even under the Gabelak rationale for adjunctive relief, then the statute would start running. On the other issue, as to specific intent, even if the statute hadn't run, we think on the merits, it's very clear in this case that there was no evidence of specific intent to prevent, to illegally prevent the plaintiff's repellents from obtaining pension or other benefits that they might have been entitled to. The so-called evidence, and I don't have time to go through all of it, some of it's been discussed here, but to say that the principles involved between Johnson Controls and Hoffman & Rhodes knew each other because they met when Mr. Scherzer, the vice president of Hoffman & Rhodes, who worked at another company, certainly doesn't prove intent. The statement that one of the goals of outsourcing this work was to save costs is not sufficient to prove specific intent. General statements like that are not sufficient. They're too vague. They're too general. And so when Mr. Scherzer says he doesn't understand what insufficient means, insufficient means it doesn't rise to the level of evidence to prove specific intent. And none of the items that he cites rise to that level. Email is another example. Mr. Clark, as it relates to your client, Johnson Controls, so why shouldn't we follow the decision of the Ninth Circuit on the conspiracy question? Because, after all, doesn't Section 510 refer to any person? It seems to me that the Ninth Circuit, which has looked at this issue, has interpreted anybody who was involved in this, and certainly Johnson Controls had involvement in this decision. They weren't your employees at the time it was terminated, but clearly without your proposal, which was accepted, and your taking over the Technical Services Division staff, this whole outsourcing wouldn't have happened. So why isn't the Ninth Circuit correct in their analysis? Well, Your Honor, the Ninth Circuit case actually had a strange procedural history, too. When it went up to the Supreme Court, the Supreme Court took it on one issue. There was a conflict in the circuits as to whether deprivation of welfare benefits, which technically don't vest health benefits, don't vest, is covered by Section 510. And the Ninth Circuit held that pension benefits were covered by 510, but welfare or health benefits are not. The Supreme Court not only reversed the Ninth Circuit, but it vacated the opinion, so that I'm not sure how viable that case is at this point. I know in a footnote, at least Footnote 5 of the Ninth Circuit opinion, it does say we reject the argument that conspiracy doesn't apply under Section 510. It's kind of a wild card. Obviously, we're not bound by what they decide, but their reasoning, we're certainly entitled to look at their reasoning as to how they came to their conclusion. Yes, but this Court also, in the Becker v. Mack truck case, looked at the ERISA language and held that a refusal to rehire is not mentioned in the statute and compared it to the National Information Act, which says the statute has to be strictly construed and you cannot infer a cause of action under ERISA if it is not spelled out by Congress. And we submit the conspiracy is not spelled out. Conspiracy is not spelled out, but as Judge Fisher suggests, I'm not sure we even need the reasoning of the Ninth Circuit, what was it, the Tenge case, to tell us what the word person means for purposes of a strict construction of the statute. But in all cases except maybe Intermo and two other cases from the Ninth Circuit, we're not aware of any cases ever allow conspiracy under ERISA. In fact, in this Court's EICORN case, there were two claims, an antitrust claim brought against a parent, a subsidiary, and the new buyer of the subsidiary under one of the claims. And the Court threw that one out saying the refusal to rehire those employees was valid under the Sherman Antitrust Act, but it might have implicated Section 510. But the problem is the plaintiffs did not sue the new buyer of the company. It only sued the former employer of the employees who had been terminated. So I don't believe this Court's ever recognized it. The Cipollone case certainly straight out said conspiracy is not a viable claim under ERISA. And one other point on Cipollone, Cipollone on statute of limitations did not say that the cause of action included on termination. It said that the case was not right mainly because the contract to outsource the employees had not been finalized and signed and it wasn't a final deal until it was a final deal and the suit was premature. I think I've used my time, Your Honors, and I apologize for running over a little bit. Thank you. Mr. Ridley? Good morning, Your Honors, and may it please the Court. John Ridley of Turner Bill and Wreath representing Hoffman LaRoche. Your Honors, in the very first pleading in this case, the original complaint, at a point in time when the complaint was filed on behalf of an association under Rule 23, the plaintiffs alleged at paragraph 20 of that complaint, on October 21, 1997, members of the association received notice of their termination from Hoffman LaRoche from Raymond Scherzer. It was only when we raised the statute of limitations defense that the plaintiffs' theory of when they learned of their termination changed and they began to attempt to backtrack and say that they had options to remain, etc. But the fact of the matter is, as Your Honors are aware, in the Rule 1006 summary that we presented to the trial court, all of the plaintiffs, with the exception of Meacham who was out on disability, acknowledged ultimately that they were aware of their termination. They all signed the documentation, and it's not one piece of paper. It's five or six pieces of paper. They all signed the documentation to become employees of Johnson Controls prior to November 1st. If I can address Judge Dowd's concern about the 23-month delay, respectfully, Your Honor, I think that that was considered, addressed, and rejected by the Supreme Court in Ricks. In that case, the court was dealing with an issue of a denial of tenure to a black professor at Delaware State University. And he was denied tenure, he filed a grievance, and that grievance was adjudicated during a one-year terminal contract that he had with the university per university. I'm familiar with Ricks, but this is an ERISA case. This isn't a Title VII case. Your Honor, I don't know that there's any rationale that would suggest that we look at the occurrence of the cause of action differently in an ERISA case. These people are not arguing that they didn't know that their benefits would change by virtue of their termination. They knew that at the point in time when they were terminated, when they learned of their termination by Roche. So I don't think that there's any... If, in fact, it happened. Excuse me? If, in fact, it happened. As I understand, some of the people who were given notice are going to be terminated. We're not terminated. Your Honor, there's only one, I believe, in the record. Dawn Ruggiero, who was one of the 181 people who were given notice on October 20th that they would be terminated, effective November 3rd. She was able to obtain the position. She was an administrative assistant or secretary. She obtained a position elsewhere in the company. That does not, in my... I suggest to the Court, defer the running of the statute of limitations with respect to this group of people. They were all on notice. In the Ricks case, if Professor Ricks had been able to obtain relief in his grievance procedure, he would not have been terminated. But the Court rejected, and the dissent argued in Ricks, that, in fact, that there was a point in time when the grievance was denied that the statute should have begun to run. There were two dissents in Ricks. One said, no, it's the date of termination, not the date he was told he would be terminated, a year earlier. And the other dissent was, well, it should be the point in time when the grievance is finally denied that the statute begins to run. The majority in Ricks, through Justice Powell, said no. The fact of the matter is, the fact that the effects of the decision, the termination, don't occur until later, is insufficient to defer the running of the statute of limitations. And I submit to Your Honor, respectfully, that while there is no Supreme Court case addressing the 5-10 situation, I think that total Carroll Touch case, and the subsequent cases in the Seventh Circuit, are logically sound, and that the applicability of the Ricks and Chardon analysis should attach to this case as well. And if that does attach, these plaintiffs, on the record that is before the Court, clearly should be found to have come outside of the statute of limitations. I think that the language that was used on October 20th by Mr. Scherzer, the notice that went out to all employees on the next day, make it crystal clear to all of these people that they were going to be terminated. Yes, there are job postings at Roche all of the time. It's a big company. Someone might have been fortunate enough, if they wished, to have successfully applied for and obtained a job. That does not, respectfully, defer the running of the statute of limitations with respect to the 181 terminates. Your Honor, I'd also like to address, if I may, very briefly, the merits issue. And I think that there are a couple of documents which were generated contemporaneously with the decision-making process at Roche that are, frankly, dispositive of the case. And I refer specifically to the presentation by Mr. Scherzer to the Pharmaceutical Leadership Board at Roche, called the PLB, and it's in the record, and the minutes of that meeting. And that is the rationale that Scherzer presented to the most senior management of the company in mid-October for why he should proceed with this contract with Johnson Controls, which would result, obviously, in the termination of these 181 employees. The second document, and I believe it's extraordinarily valuable and important, is the memorandum which Mr. Scherzer wrote immediately thereafter to the head of human resources, entitled, Reasons for Outsourcing. It's on page 1195 in the appendix. And it sets forth Scherzer's rationale for entering into this contract. And there are eight separate reasons which Mr. Scherzer lays out, and only the eighth one of those is cost efficiencies, cost reductions. He is hopeful that there will be cost reductions as a result of this. But the primary rationale that Mr. Scherzer utilizes in making this decision to propose and to have the PLB accept this significant decision at Roche is totally unrelated to even costs, no less pension cost savings. The primary rationale, as Scherzer sets it forth, deals with proprietary technologies that Johnson Controls has. He says in the memo that by February, within four months, JCI is going to have installed its Maximo CMMS computer systems, which will revolutionize the way that Roche deals with its technical services issues.  There are maintenance procedures which are standardized, which they're expert at. And he is aware that this technical services function, which he runs, is not a core function at Roche. It is important that Roche be able to use the best and the brightest to perform this service, and that's why he is going forward with this. I submit to your honors that the plaintiffs here have in no way been able to demonstrate, nor hardly even suggest, frankly, that this is a pretextual rationale for an exercise which they suggest is specifically intended to violate the 510 rights of the plaintiff group and to void their entitlements to benefits. Why do you use the word specifically to violate 510? Why does it have to be a specific violation? Because I believe that the case law under Section 510 speaks in terms of a specific intent being required to be proven. Do you use the word specific? I'm sorry? The case law uses the word specific? Yes, your honor. As opposed to general? Yes, your honor. Or incidental? No, I don't think that an incidental intent, I don't know how that would be, frankly, but I think, and I have trouble conceptualizing, an incidental intent. But my understanding of the law is that there is a requirement that the plaintiffs demonstrate a specific intent, and I think that goes back to Gavilic in the cases which, you know, subsequent to that. Thank you. Your honor, I see that my time is up. Do you have any questions? Let me ask you this on the merits issue. Did the district court conclude on the merits issue that the appellants had established the prima facie case? Your honor, I can't answer that with certainty. It looked at the evidentiary presentation as being direct evidence and circumstantial evidence, and found that there was no direct evidence, and it found then that there was demonstrably inadequate circumstantial evidence. I don't know whether the court, I'm not comfortable in saying that the court actually utilized the McDonnell Douglas analysis. If we come to the conclusion that there is no direct evidence and we have to look at circumstantial evidence, we obviously need to use the McDonnell Douglas burden-shifting test. We can make that determination ourselves, both as to the prima facie case, the legitimacy of your reason, and the existence of a pretext, can we not? Yes, your honor. And you would argue that your reason was not pretextual? Your honor, I believe that if you're using a McDonnell Douglas analysis, assume for the moment that there was a prima facie case, and I'm not comfortable with that analysis. Let's just assume that. Go ahead along that line. Your honor, we have clearly articulated and demonstrated and proven, I think, a legitimate, non-discriminatory, non-violative reason for the exercise and for the contract, and I think that that's best evidenced by the documents that I recited earlier. Then the plaintiff has the burden of coming back to prove either that our stated rationale is pretextual or that it's not worthy of belief, and that is where they have unquestionably fallen woefully short. But our review is plenary, so in the end, even if the district court didn't apply the correct burden-shifting analysis, we can effectively do it for them. Absolutely, your honor, and I think the court did correctly apply the last prong of the McDonnell Douglas, what I call the third prong of McDonnell Douglas. I just don't know whether the prima facie case analysis was looked at in that McDonnell Douglas light. Thank you very much. Thank you, your honor. Thank you, Judge Ridley. Mr. Sciarra will hand it back over to Butler. Your honors, if I may very quickly. With regard to the first pleading, I've worn that for seven years now. With regard to the first motion, and it was funny, in the haste in which I drafted these pleadings to get them out in time, with regard to the first motion, there was no mention of any case, and this is why I've made your honors law clerk suffer through 6,000 pages of appendix. There is no mention in the first motion. I can assure you on this court, it's joint suffering. The law clerks don't suffer through anything. The judges don't. I apologize then for all suffering. They might have a different answer to that. In their first pleading on January 20th, 2000, there was no mention of any case whatsoever that in any way suggested that the Ricks analysis, which they put in there, had any impact on a 510. They found the toll case and created this argument after the fact. I congratulate Mr. Ridley. He's an excellent attorney, and I have learned much during the course of these proceedings. With that said, the issue is very simple. Did Dawn Ruggiero, the one plaintiff, or non-plaintiff rather, have a cause of action on October 20th through November 3rd? Did she ever have a cause of action? And if she never did, because she was given all the other notification and information, all the other signatures and everything else she signed, if she never had a cause of action, then how could anybody else have had a cause of action only to give a retroactive effect? And the consequence of that will be the 23-month notice where then no one has a cause of action for 23 months, and then there's retroactive effect as it relates to when the statute runs. I appreciate Judge Dowd and Your Honors looking at that issue. The other piece, very quickly, is, Judge, it is a motivating factor. The savings on the pensions have to be a motivating factor. That is the standard. It can be several factors which they go through, several factors that they look at, but if one of them is a motivating factor to save on their pensions by eviscerating their benefits, then we have demonstrated not only a prime official case, but we've overcome a pretext, and at the very least we're entitled to a trial on the issue. And as it relates to that, number eight in that document, the courts have also said continuously, you're never going to find, or very rarely will you find, a smoking gun. I'm not going to be able to present a nice memo that says, let's eviscerate their pensions and save money. All right, but your circumstantial evidence has to be probative for purposes of raising a question of fact, of specific intent. Absolutely. Specific intent. I concur that there has to be circumstantial evidence if Your Honors do not adopt the direct evidence that we've presented. With that said, one case very clearly says, I know I'm in front of you at this juncture, says you can present an expert report. We have a $25 million savings, which is unrebutted by anybody in the defense side. Now, the judge below said, well, they say this and this about it. The district judge found considerable problems with your expert's methodology. That's fine, Judge. He can. As a fact finder, he's entitled to do that. But not as a judge sitting at summary judgment, especially when he wasn't opposed and there was no controversy. That is totally contrary to the entire movement of evidentiary law since Daubert, for example. And I realize that Daubert is not an issue in this case. But to suggest that the district court is acting as a fact finder when we have clearly, and the Supreme Court has clearly declared that the role of the district judge as a gatekeeper is primary. That's not a credibility issue. That is not an issue of fact. That is the district court ruling as a matter of law on a question of admissibility. And the district court, therefore, is entitled to look to issues of methodology, as I understood the district court hearing. Judge, admissibility as it relates to evidence of trauma. I'm only suggesting that we presented that and numerous other documents which demonstrate at the very least questions of fact which go to whether or not there was a specific intent to interfere with evidence. I understand. Thank you very much. Thank you very much, counsel. And thank you to all of counsel. This case was well-briefed. It was well-argued. It presents a number of interesting questions, and we will take them out under advisement.